# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| T.C. ON BEHALF OF HER MINOR CHILD, S.C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:17-cv-01098 |
| ) | Judge Trauger |
| METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE AND DAVIDSON COUNTY, ) | LEAD CASE |
| TENNESSEE, D/B/A METROPOLITAN ) | |
| NASHVILLE PUBLIC SCHOOLS, ) | |
| ) | |
| Defendant. ) | |

_____

| | |
|---|---|
| JOHN DOE AND JANE DOE #1 ON BEHALF ) | |
| OF THEIR MINOR CHILD, JANE DOE #2, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:17-cv-01159 |
| ) | Judge Trauger |
| METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE AND DAVIDSON COUNTY, ) | Member Case |
| TENNESSEE, D/B/A METROPOLITAN ) | |
| NASHVILLE PUBLIC SCHOOLS, ) | |
| ) | |
| Defendant. ) | |

_____

| | |
|---|---|
| SALLY DOE ON BEHALF OF HER MINOR ) | |
| CHILD, SALLY DOE #2, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:17-cv-01209 |
| ) | Judge Trauger |
| METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE AND DAVIDSON COUNTY, ) | Member Case |
| TENNESSEE, D/B/A METROPOLITAN ) | |
| NASHVILLE PUBLIC SCHOOLS, ) | |
| ) | |
| Defendant. ) | |

_____

MARY DOE #1 ON BEHALF OF HER MINOR )
CHILD, MARY DOE #2, )
                                   )
        Plaintiff, )
                                   )
v.                                 ) Civil No. 3:17-cv-01277
                                   ) Judge Trauger
METROPOLITAN GOVERNMENT OF         )
NASHVILLE AND DAVIDSON COUNTY,     ) Member Case
TENNESSEE, D/B/A METROPOLITAN      )
NASHVILLE PUBLIC SCHOOLS,          )
                                   )
        Defendant. )

## MEMORANDUM

Pending before the court in these consolidated cases are five sealed Motions for Summary Judgment. Four Motions for Summary Judgment were filed by the Metropolitan Government of Nashville and Davidson County d/b/a/ Metropolitan Nashville Public Schools ("MNPS"). (Doc. No. 71 (regarding S.C.[1]); Doc. No. 76 (regarding Jane Doe); Doc. No. 82 (regarding Mary Doe); Doc. No. 83 (regarding Sally Doe).) Jane Doe, Sally Doe, and Mary Doe collectively filed a Motion for Partial Summary Judgment (Doc. No. 87) regarding a portion of their claims. On May 6, 2019, following briefing on the Motions, the court entered an Order granting MNPS summary judgment with regard to one of Sally Doe's claims and otherwise denying all five motions. (Doc. No. 102.) On June 11, 2019, the court granted MNPS a

---

[1] The naming conventions used by the parties are, in the context of the cases' having been consolidated, somewhat confusing and, therefore, will be streamlined slightly by the court. Three of these plaintiff students have taken the fictive surname Doe (despite not sharing the same actual surname), along with different fictive first names. However, their mothers—who, alone or with the students' fathers, filed the suits on the students' behalf—have taken the same fictive first name/surname combinations as their daughters, differentiated from the daughters only numerically. For example, Mary Doe #1 is the mother of Mary Doe #2, Jane Doe #1 is the mother of Jane Doe #2, and so forth. The court will simply refer to each student by the chosen pseudonym, without a numerical modifier, and refer to any parent just as the student's parent—e.g., as "Mary Doe" and "Mary Doe's mother." When discussing procedural matters in this court, the court will use the unmodified pseudonym to refer to the student acting through her parent or parents. For the one plaintiff using a different naming convention—S.C., who is suing through her mother T.C.—the court will use "S.C." to refer to both the individual student and to T.C. when acting in this court on S.C.'s behalf.

Certificate of Appealability regarding its ruling. (Doc. No. 112.) On January 24, 2020, the Sixth Circuit granted permission to appeal, vacated this court's order, and remanded the case for reconsideration in light of *Kollaritsch v. Michigan State University Board of Trustees*, 944 F.3d 613 (6th Cir. 2019). (Doc. No. 113.) At the direction of the court, the parties filed Supplemental Briefs regarding the effect of *Kollaritsch* (Doc. Nos. 122 (plaintiffs' joint Brief), 123 (MNPS's Brief). For the reasons set out herein, the court will deny the plaintiffs' motion, grant MNPS's motions regarding Sally Doe and Jane Doe, and grant in part and deny in part MNPS's motions regarding Mary Doe and S.C.

## I. BACKGROUND[2]

"Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 465–66 (1999). Title IX, like other federal antidiscrimination laws,[3] recognizes that discrimination can, in some cases, take the form of harassment. See *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999). In 2016 and 2017, at least four female MNPS students, all minors, were videotaped[4] by other students while engaged in sexual

---

[2] The relevant facts were set forth in detail in the court's original Memorandum. (Doc. No. 101.) The court will provide a slightly amended version here, with additional facts regarding procedural and legal developments following the court's prior ruling.

[3] *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (discussing harassment under Title VII); *Brown v. Metro. Gov't of Nashville & Davidson Cty.*, 722 F. App'x 520, 525 (6th Cir. 2018) (discussing harassment under the Age Discrimination in Employment Act); *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (discussing harassment under the Americans with Disabilities Act); *Greenan v. Bd. of Educ. of Worcester Cty.*, 783 F. Supp. 2d 782, 788 (D. Md. 2011) (discussing harassment under the Pregnancy Discrimination Act).

[4] The parties use various terms to refer to the video recordings at issue here, including "videos" and "videotapes." The actual recordings appear all to have been made on mobile phones and thus were not, as a literal matter, "tapes," insofar as that term suggests the existence of an actual physical cartridge encasing magnetic tape. Rather, the recordings existed as files on electronic devices. The court will use the various terms that may refer to a video

3

encounters with male students on the premises of their respective MNPS schools. The resulting video files were circulated among the students' peers electronically. The plaintiffs, through their parents, have sued MNPS, arguing that its handling of the matters and general approach to harassment at its schools led to the deprivation of the plaintiffs' rights under Title IX and their constitutional rights to equal protection.

## A. Title IX in MNPS

Federal regulations require that a recipient of funding under Title IX "shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under [Title IX rules], including any investigation of any complaint communicated to such entity alleging its noncompliance with [Title IX rules] or alleging any action which would be prohibited by [Title IX rules]." 45 C.F.R. § 83.15(a). That employee is known as the recipient's "Title IX coordinator." The funding recipient must "notify all of its students and employees who work directly with students and applicants for admission of the name, office address and telephone number of the" Title IX coordinator. *Id.* MNPS's Title IX coordinator, from 2012 through the 2016–17 school year, was Julie McCargar. (Doc. No. 92-25 at 18, 24.)

McCargar testified that she and others in her office received outside training and worked closely with the city's legal department in understanding how to conduct Title IX investigations. (*Id.* at 50.) She testified that, in contrast, principals and assistant principals did not, to her knowledge, receive training regarding how to conduct a Title IX investigation until late in her tenure as coordinator. (*Id.* at 50.) Principals and assistant principals also were not required to read the Dear Colleague letters that the Title IX coordinator was expected to read to stay abreast of federal Title IX policy. (*Id.* at 51–52.) Phyllis Dyer, who worked with McCargar and succeeded her as Title IX coordinator, explained that principals did finally receive some training

recording interchangeably to refer to copies of the files.

at some time around or after May 2016. (Doc. No. 92-18 at 54).

Even before they received training, however, the principals and assistant principals were permitted to perform Title IX investigations themselves, rather than relying on the Title IX coordinator. (Doc. No. 92-25 at 53, 59–60.) McCargar further testified that she could not recall ever telling the principals to contact her when they became aware of possible Title IX violations. (*Id.* at 59.) If the principal determined that an incident did, in fact, rise to the level of a Title IX violation, only then would the principal inform the coordinator. (*Id.* at 79–82.)

The plaintiffs suggest, persuasively, that the policy McCargar described violated the guidance that had been provided by the U.S. Department of Education's Assistant Secretary for Civil Rights in a Dear Colleague Letter issued on April 24, 2015. (Doc. No. 1-5.) According to the letter, a Title IX funding recipient "must inform the Title IX coordinator of all reports and complaints *raising Title IX issues*, even if the complaint was initially filed with another individual or office or the investigation will be conducted by another individual or office." (*Id.* at 3 (emphasis added).) As the plaintiffs point out, the universe of complaints raising Title IX issues is presumably significantly larger than the universe of complaints where a principal has made an affirmative finding of a confirmed Title IX violation. This may be especially true where the principal has not received sufficient Title IX training and therefore fails to identify some Title IX concerns.

When asked about MNPS's compliance with the Department of Education's guidance, McCargar admitted that she was not informed of all complaints "raising Title IX issues," if "informed" meant that she was directly contacted in writing or by phone. While she did receive direct notice of cases where principals ultimately concluded that a violation had occurred, she was not informed in that manner where a complaint raised Title IX issues, but the principal

ultimately found no violation. (Doc. No. 92-25 at 95.) Rather, McCargar explained, she had interpreted the Department's guidance as requiring only that incidents that had raised Title IX issues, but that principals had not deemed to be violations, be entered into a "student management system," to which the coordinator had access. (*Id.* at 96.)

Dyer, as McCargar's successor, provided some context regarding how the Title IX coordinator's duties were structured during the relevant time period. Dyer explained that, while MNPS, as required, did have a designated Title IX coordinator, Title IX coordinator was not that person's sole job. Rather, the duties of Title IX coordinator were rolled into the job of the executive director of federal programs, who is responsible for ensuring that federal funding from all applicable federal programs, not just Title IX, is obtained and integrated into MNPS's budget. (Doc. No. 92-18 at 22.) Title IX does not require the Title IX coordinator to perform that job full-time. The April 24, 2015 Dear Colleague Letter, however, addressed the benefits of doing so:

> Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest and in many cases ensure sufficient time is available to perform all the role's responsibilities. If a recipient designates one employee to coordinate the recipient's compliance with Title IX and other related laws, it is critical that the employee has the qualifications, training, authority, and time to address all complaints throughout the institution, including those raising Title IX issues.

(Doc. No. 1-5 at 3.) Dyer admitted that there were many days when she did not devote any time to Title IX matters, with weeks sometimes passing without her performing any Title IX-specific duties. (Doc. No. 92-18 at 22, 36.) When asked whether it was "true that [she] spend[s] most of [her] time making sure that [the multimillion-dollar federal funding figure for a particular year] is received by [the] Metro school system," Dyer responded, "Yes." (*Id.* at 23.) When asked about the division of responsibilities between principals and the coordinator, Dyer's position largely echoed McCargar's, with the coordinator's responsibilities only arising after a principal

6

affirmatively determined that a violation occurred. (*Id.* at 64–65.) She confirmed that she, like McCargar, was not made aware of the incidents at issue in these cases. (*Id.* at 89–91.)

## B. Incident at Maplewood: Mary Doe and Jane Doe

Mary Doe and Jane Doe were freshmen at Maplewood High School when, on September 21, 2016, they were part of a sexual encounter involving the two of them and four older male students in a school stairwell. Jane Doe has attested that she was intimidated by the age, size, and number of male students involved and, although she did not welcome the sexual activity, she "did not know how to get out of the situation." (Doc. No. 92-8 ¶ 4.) Mary Doe has similarly attested that she did not expect or welcome sexual activity but was intimidated and did not know how to stop it. (Doc. No. 92-10 ¶ 4.)

A male student videotaped the incident, and the video was ultimately circulated among the students' peers. (Doc. No. 92-3 ¶¶ 19–20.) Both girls have attested that they did not consent to being taped or to the tape's being circulated. (Doc. No. 92-8 ¶ 5; Doc. No. 92-10 ¶ 6.) That night, Mary Doe told her mother a false version of the incident in which she did not reveal the extent of actual sexual activity involved in the encounter. (Doc. No. 92-3 ¶¶ 12.) Mary Doe's mother contacted Assistant Principal Marvin Olige about the event, and Mary Doe, her mother, and her grandmother met with Olige and police officers stationed at the school as "School Resource Officers" ("SROs"). (*Id.* ¶¶ 13–14.) Mary Doe reiterated the inaccurate version of events she had told her mother and provided a written statement to that effect. (Doc. No. 77-3.) The SROs, however, pressed Mary Doe about inconsistencies between her account and other information they had received, and she admitted that the version of the story she had given her mother was inaccurate. Olige, the SROs, and Mary Doe's mother, however, appeared to remain unaware of the actual details of the encounter. (Doc. No. 92-3 ¶ 18.)

7

The parties disagree about the precise series of events through which MNPS and the girls became aware that the video was being circulated but agree that, in the ensuing weeks, a number of people became aware of the video's existence and circulation. (*See id.* ¶¶ 19–23.) At some point, the girls became aware that other students had copies of the video. Jane Doe heard that, in connection to the circulation of the video, people were calling her demeaning sexual names like "whore" and "slut." (Doc. No. 92-8 ¶ 6.) Jane Doe's brother also became aware of the video and informed her parents. (Doc. No. 76-4 at 28.) On October 12, 2016, Jane Doe's parents reported the video to school officials and met with SROs and Assistant Principal Olige. (Doc. No. 89 ¶ 43; Doc. No. 92-3 ¶ 24.) Upon learning that Mary Doe was the other female student in the video, Olige pulled her out of class to be questioned. (Doc. No. 89 ¶ 44.)

Jane Doe's mother has attested that she told Olige and the SROs that the video had been made without Jane Doe's knowledge or consent and "circulated at the school and other places." (Doc. No. 92-7 ¶ 3.) She further attested that, in the meeting, Olige and the SROs focused mainly on whether the underlying sexual conduct was forcible rape. (*Id.* ¶ 5.) Jane Doe and Mary Doe confirm that Olige's questioning was focused on whether forcible rape had occurred. (Doc. No. 92-8 ¶ 7; Doc. No. 92-10 ¶ 5.) Olige did not tell Maplewood Executive Principal Keely Mason about the sexual activity or the video file until after at least one of the underlying lawsuits had been filed. (Doc. No. 89 ¶ 55.) Olige also did not refer the students or their parents to MNPS's Title IX coordinator; nor did he suggest to them that a Title IX investigation would or should occur. (Doc. No. 76-4 at 50.)

Jane Doe attested that, following the meeting, she was "scared to remain at Maplewood." (Doc. No. 92-8 ¶ 11.) The day after the meeting with Olige or shortly thereafter, Jane Doe's parents enrolled her in a new school, and she never returned to Maplewood. (Doc. No. 76-4 at

8

30–31.) Jane Doe's mother has characterized the school to which she transferred as having less comprehensive classroom and extracurricular opportunities. Moreover, Jane Doe had been participating in a "College Zone" program at Maplewood, which was intended to help students prepare for and gain admission to college, but her new school did not offer such a program. (Doc. No. 92-7 ¶¶ 12–13.) Jane Doe ultimately failed tenth grade at the new school. (*Id.* ¶ 15.)

At first, Mary Doe remained at Maplewood. She has described substantial taunting and bullying she received at Maplewood related to the video, including students calling her "nasty" and saying she "got a train run on" her. She says that she complained to school personnel about the bullying, but they "didn't do anything about it." (Doc. No. 92-10 ¶ 11.) She said that, when she would make a new friend, students would then target and bully the friend for "hanging around a nasty person." (*Id.* ¶ 13.) According to Mary Doe, at one point a boy grabbed her thighs and told her he wanted her to do the same thing to him as she had done in the video. She claims that she told Olige about the event but that he took no action that she was aware of. (*Id.* ¶ 14.)

Mary Doe eventually attended a meeting with Maplewood Dean of Students Jamie Hall and another person about the events and her coping with them. Doe testified that she had informed Hall that she had been having suicidal thoughts in the wake of the incident. In her deposition, Mary Doe described the following exchange:

> They said it was, like, a game called ["]Exposed["] that the seniors do. And I was like, I don't know what that is. . . . I was talking to, I think, Ms. Hall, and she was talking to me—who was I talking to? Who else was in there? There was somebody else in there. And I was upset, at the moment, and I was crying. She was like, What is wrong with you? It was about the situation. She was like, It's the game. It's a game that the seniors play, and you shouldn't worry about it. It's not nothing you should want to kill yourself over and all this. I was like, But it's a video of me out there that I didn't know nothing about, so I should really be upset about it.

(Doc. No. 92-23 at 77.) Mary Doe—who attested that she had, prior to these events, been a

content and gregarious Maplewood student—concluded that she could not be happy at Maplewood and transferred to another school. (Doc. No. 92-10 ¶ 16.) Mary Doe's mother has stated that she felt she had no reasonable alternative but to seek the transfer. (Doc. No. 92-9 ¶ 8.)

Olige elected not to punish any of the students involved in the sexual activity or videotaping "beyond verbal discipline," because it was "an opportunity to impart some wisdom and life instruction," and he "did not want to subject the students to potential humiliation and discipline for a consensual act." No other, higher-level administrator was involved in his decision. (Doc. No. 89 ¶¶ 61–62; *see* Doc. No. 70-16 at 11.)

MNPS provides schools with a two-page "Bullying and Harassment Reporting Form" that includes spaces for specifying what offenders did and what, if any, electronic communications were used. (Doc. No. 70-17 at 1–2.) Olige testified that he knew that, if he had filled out such a form, it would have begun a process of the school's determining whether a Title IX violation had occurred. (Doc. No. 77-1 at 104.) However, he did not fill out a reporting form related to any of the events involving Jane Doe and Mary Doe. (Doc. No. 89 ¶ 66.) Olige testified that, if he had ever been instructed by the district to refer cases involving circulation of sexual videos of students to the school's executive principal or to the Title IX coordinator, he would have done so. (Doc. No. 77-1 at 87.)

Another Maplewood Assistant Principal, Isaiah Long, testified that, in his view, MNPS standard operating procedures, effective as of May 2016, required an assistant principal who became aware of sexual activity being taped at school to report the activity to the executive principal. He further testified that such actions would have warranted substantial punishment, regardless of whether the underlying sexual activity had been consensual. Long, however, was not made aware of the events at issue here until after litigation began. (Doc. No. 89 ¶¶ 70–73.)

Executive Principal Mason agreed that she should have been informed of the events and that the reporting form should have been used for any sexual cyberbullying on the Maplewood campus. (*Id.* ¶¶ 77–81.) Mason testified that, had she been aware of the events, she would have punished the students involved. She further testified that she would have treated the release of a sexually explicit video of a student without the student's consent as itself requiring discipline. (*Id.* ¶ 89; Doc. No. 70-12 at 68.)

Jane Doe, through her parents, filed her Complaint on August 16, 2017. (Case No. 3:17-cv-01159, Doc. No. 1.) Mary Doe, through her mother, filed a Complaint pleading the same causes of action on September 18, 2017. (Case No. 3:17-cv-01277, Doc. No. 1.) Counts I and II of the Complaints are for Title IX violations related to MNPS's actions, respectively, before and after the stairwell incident. Count III is a claim under 42 U.S.C. § 1983, based on MNPS's failure to train its employees with regard to sexual harassment. Count IV is a claim under 42 U.S.C. § 1983, based on MNPS's deliberate indifference to ongoing harassment. (Case No. 3:17-cv-01159, Doc. No. 1 ¶¶ 53–73; Case No. 3:17-cv-01277, Doc. No. 1 ¶¶ 38–58.)

## C. First Incident at Hunters Lane: Sally Doe

On February 21, 2017, Sally Doe—then a freshman at Hunters Lane High School—engaged in a sexual encounter with a boy, O.B., in a Hunters Lane boys' restroom. (Doc. No. 92-4 ¶ 3.) Sally Doe has attested that she was pulled into the restroom and did not understand or expect that sexual activity was going to occur, she was pressured to engage in the sexual activity, and, although she did not physically fight the sexual activity, she was scared, did not know how to prevent it, and did not consider it welcome. She stopped the sexual activity before completion. (Doc. No. 92-6 ¶ 4.) The encounter was recorded on video—Sally Doe believes, by O.B. with his phone. Sally Doe attested that she did not realize she was being recorded and did not welcome or

consent to the recording. (*Id.* ¶ 5.)

The same day, administrators learned that Sally Doe had been seen in or going into the restroom with O.B., and Assistant Principal Melanie McDonald pulled Sally Doe out of class to explain the situation. McDonald asked Sally Doe what she had been doing in the boys' restroom and if she had had sex while there. Sally Doe responded that she had not had sex in the restroom. (Doc. No. 83-1 at 16–17.) McDonald had Sally Doe provide a written statement about the matter, and, in the statement, Doe stated only that she and O.B. had gone into the bathroom to discuss something. (Doc. No. 83-4 at 23.) Both students were placed on "overnight suspension." (Doc. No. 83-2 at 2–3.) The next day or the day after, Sally Doe and her mother met with Assistant Principal Nicole Newman, and Sally Doe admitted to having kissed O.B. but not to the sexual activity. (Doc. No. 83-1 at 21–22; Doc. No. 83-2 at 9.)

About a month and a half later, on April 7, 2017, another female student, with whom Sally Doe had apparently had a personal falling out, posted the video of the February 21 bathroom encounter on Instagram and "tagged"[5] Sally Doe. Sally Doe does not know how the girl who posted the video obtained it. (Doc. No. 92-4 ¶¶ 5–6.) Several of Sally Doe's friends and acquaintances saw the video when it was posted. Sally Doe does not know exactly how many of her peers viewed the video but testified that she believed that "it was a lot of people." (Doc. No. 83-1 at 26.) The same day that Sally Doe first saw the video, her mother found out about the video from a family member who, presumably, had seen or become aware of the Instagram post. (*Id.* at 24.)

The next day, Sally Doe's mother went to Hunters Lane to alert the school of the

---

[5] "Tagging" refers to including another person's user name in a social media post, often to indicate that the post depicts the "tagged" person and/or to inform the "tagged" person of the post by causing that user to receive a notification. For example, a person who posted a photograph of herself with her best friend might "tag" the best friend to indicate that she is the other person in the picture and let her know that the

situation. She met with Assistant Principal Newman, who was in charge of overseeing ninth grade students, and an SRO. (Doc. No. 70-3 at 42–43; Doc. No. 83-1 at 26; Doc. No. 89 ¶¶ 1, 5.) Newman's recollection of the meeting is limited. Newman testified that she does not remember whether she asked Doe who was circulating the video. Newman also does not recall whether she took notes. (Docket No 70-3 at 49.) Sally Doe's mother has attested that she told Newman that she "wanted [her] daughter protected and if that meant that the boy involved had to be suspended or expelled, then that is what should occur." (Doc. No. 92-5 ¶ 4.) She also attested that Newman and the SROs focused their questions on the issue of forcible rape and did not raise the issue of a possible Title IX violation or the possibility that the underlying events may have been non-forcible but unwelcome. (*Id.* ¶ 7.)

Newman did not, to her recollection, inform the executive principal of Hunters Lane, Susan Kessler, about the events. (Doc. No. 89 ¶ 5.) Newman testified that she could not recall receiving any training, either at Hunters Lane or outside Hunters Lane, on how to conduct a Title IX investigation. (Doc. No. 70-3 at 108.)

The record includes an email exchange between Sally Doe's mother and Newman, beginning on April 11, 2017. (Doc. No. 83-7 at 1–6.) Sally Doe's mother described the bullying that Doe was apparently facing at school. Other students were "yelling and throwing things at her as she walk[ed] down the hallway," so much so that she had to put her headphones in to attempt to drown them out. (*Id.* at 5.) O.B. "tried to fight her . . . in front of a large crowd" and "told her he was going to have someone . . . beat her up." (*Id.*) "A student in one of her classes had the video[] and was talking to the teacher about it[,] even offer[ing] to show the teacher," although the teacher refused. (*Id.*) Sally Doe's account of events confirms that she was taunted by her peers with sexually demeaning names such as "ho" and "slut" and that O.B. threatened her.

---

photo has been posted.

(Doc. No. 92-6 ¶ 8.)

On April 12, 2017, Sally Doe's mother wrote, "There is absolutely no way I can send my child to this detrimental environment every day." (*Id.* at 5.) Newman expressed her concern for what Sally Doe was experiencing and set up a meeting with Sally Doe's father for the next day to "talk and figure out a plan to get [Sally Doe] thr[ough] the rest of the year." (*Id.* at 4.) Sally Doe's mother responded that Sally Doe's father had tried to encourage Sally Doe to speak to Newman more about the situation, but that Sally Doe had said there was "no point" because the Hunters Lane administration "c[ould]n't control everyone." Sally Doe's mother wrote that she, too, was concerned that "[i]t's just too many children to reprimand." (*Id.*) Sally Doe's parents pulled her out of Hunters Lane for the remainder of the year, and she was allowed to complete her exams at home. (Doc. No. 83-1 at 29.)

By April 18, 2017, the video was, as far as the parties know, off of social media. (Doc. No. 92-4 ¶ 18.) Sally Doe, however, continued to suffer occasional taunting or provocation from other students related to the video. That summer, Sally Doe participated in a summer program at Hunters Lane, and, during the program, she had an altercation with a boy about the video. (Doc. No. 83-1 at 37.) Sally Doe returned to Hunters Lane the next year and, at one point, was mocked by another student about the video in front of her then-boyfriend. Afterwards, an assistant principal found her crying in a stairwell. (*Id.* at 39–40.) Sally Doe originally received an overnight suspension for missing class, but her mother went into the school the next day and explained the situation, after which the suspension was taken off of Sally Doe's record. (*Id.* at 41–42.)

In November 2017, a male student touched Sally Doe's buttocks without her permission while taking a picture. Thereafter, the student and Sally Doe's boyfriend got into a fight. Sally

Doe, her boyfriend, and the student who took the picture while groping her were all suspended based on the fight. Although the disciplinary documentation of the incident does not mention Sally Doe's earlier problems with the video, it does not rule out the possibility that Sally Doe's resultant reputation played a role in the boy's actions.(Doc. No. 83-10 at 5.)

Later that school year, Sally Doe was involved in an altercation, during which a student brought up the video. (Doc. No. 83-1 at 44.) By the 2018–19 school year, however, the active harassment of Sally Doe had stopped. (Doc. No. 92-4 ¶ 22.)

On August 31, 2017, Sally Doe, through her mother, filed her Complaint. (Case No. 3:17-cv-1209, Doc. No. 1.) Counts I and II of the Complaint are for Title IX violations related to MNPS's actions, respectively, before and after the bathroom incident. Count III is a claim under 42 U.S.C. § 1983, based on MNPS's failure to train its employees with regard to sexual harassment. Count IV is a claim under 42 U.S.C. § 1983, based on MNPS's deliberate indifference to ongoing harassment. (*Id.* ¶¶ 38–56.)

## D. Second Incident at Hunters Lane: S.C.

On April 17, 2017, S.C., also a freshman at Hunters Lane, was involved in a sexual encounter with a male student, J.J., on school premises during the students' lunch hour. According to S.C., all of the sexual activity that she engaged in was coerced and unwelcome, although she did not know how to stop it. (Doc. No. 92-11 ¶ 4.) Another female student, S.D., recorded the encounter on video. (Doc. No. 92-1 ¶¶ 1, 3.) S.C. testified that S.D. had—unbeknownst, at first, to S.C.—come into the room during the encounter and that, by the time S.C. saw S.D., S.D. already appeared to be recording the encounter on her phone. (Doc. No. 71-1 at 20.) Later that day, when S.C. was preparing to get on the school bus home, S.D. approached S.C. and informed S.C. that, as S.C. would later describe it, "the video was out

and . . . everybody had it." (Doc. No. 92-1 ¶ 7; Doc. No. 71-1 at 23.) S.C. left school for the day without informing any teachers or administrators about the sexual encounter or the video. (Doc. No. 92-1 ¶ 8.) At some point that night, a friend sent the video to S.C.'s mother, who became angry at S.C. (Doc. No. 71-1 at 27–28.)

A little after 9:30 p.m. that night, Executive Principal Kessler received a Facebook message from a "community member" with the video attached. (Doc. No. 92-1 ¶ 11; Doc. No. 74 ¶ 3.) Kessler claims that, by early the next morning, she had "begun [a] formal investigation of the incident." (Doc. No. 74 ¶ 5.) Kessler worked with her assistant principals as well as the school's SROs to further the investigation, and Detective Robert Carrigan, a police detective dedicated to investigating sex crimes, also came to the school. (*Id.*)

Detective Carrigan interviewed S.C. and, after the interview, informed S.C.'s mother that the sexual encounter had been consensual. (Doc. No. 92-1 ¶ 16.) S.C. gave a written statement to Kessler and did not state that she had been forced into the encounter. (Doc. No. 74-1 at 1.) She did, however, state that she had wanted to stop both the encounter and the videotaping but "just couldn't get the urge to say no." (*Id.*) According to Kessler, there was nothing about the content of the video itself suggesting that the sexual activity was non-consensual, and S.C. appeared, in the video, to have been aware of the taping. (Doc. No. 74 ¶¶ 7–8.) According to S.C., police, as part of their questioning of her, told her that she could be prosecuted for the creation of child pornography and suggested that, because J.J. had not struck or otherwise violently forced her, the activity was consensual. (Doc. No. 92-11 ¶¶ 7–8.) S.C.'s mother also stated that police suggested that S.C. could be prosecuted for child pornography offenses and that, because J.J. had not struck her on the video, it was clear that she had been a willing participant. (Doc. No. 92-12 ¶¶ 6, 8.)

Ultimately, the school punished eight students, including J.J., S.C., and S.D., for their

16

involvement in the sexual encounter and/or creating or distributing the video. (Doc. No. 92-1 ¶ 20; Doc. No. 71-1 at 38.) The other students punished were three male and two female students, all of whom were found to have shared the video. (Doc. No. 74 ¶ 9.) All of the students received the same punishment, a three-day suspension. (*Id.* ¶ 13.) According to S.C. and her mother, Kessler assured them that the matter would "blow over in one day," a prediction that they found shocking. (Doc. No. 92-11 ¶ 12; Doc. No. 92-12 ¶ 14.)

S.C. testified that she received threats directly related to her cooperation with the investigation into the incident. For example, S.D. made violent threats toward S.C. and her family due to S.C's having "snitched" on her. S.C.'s mother reported those threats to the police. (Doc. No. 71-1 at 39.) Two male students who apparently wished to discourage S.C.'s involvement in the investigation also sent messages "warning" S.C. that she would not like the consequences of cooperating because there were people "out looking for" her. (*Id.* at 45–46.) S.C.'s mother confirms that S.C. and S.C.'s sister received those threats and that S.C.'s mother complained to the school and police about the threats during the April 18 meeting. (Doc. No. 92-12 ¶¶ 11–12.) After her suspension, S.C. never returned to Hunters Lane, ultimately moving to another school outside the MNPS system. (Doc. No. 92-1 ¶ 19.)

On July 31, 2017, S.C.'s mother sued MNPS on her behalf. (Doc. No. 1.) Counts I and II of her Amended Complaint are for Title IX violations related to MNPS's actions, respectively, before and after the original incident. Count III is a claim under 42 U.S.C. § 1983, based on MNPS's failure to train its employees with regard to sexual harassment. Count IV is a claim under 42 U.S.C. § 1983, based on MNPS's deliberate indifference to ongoing harassment. (Doc. No. 6 ¶¶ 41–61.)

**E. The Court's Original Summary Judgment Ruling**

In its Memorandum, this court began its analysis from the premise—still valid at this time—that, pursuant to the Supreme Court's opinion in *Davis v. Monroe County Board of Education*, 526 U.S. 629, a school system can be held liable for Title IX damages related to student-on-student harassment, if the school system's "deliberate indifference . . . , at a minimum, 'cause[d] [the student] to undergo' harassment or 'ma[d]e [the student] liable or vulnerable' to it." *Id.* at 645 (quoting Random House Dictionary of the English Language 1415 (1966); Webster's Third New International Dictionary 2275 (1961)). (Doc. No. 101 at 23.) The court noted that "Title IX claims based on harassment or abuse can roughly be separated into two types—'before' claims and 'after' claims"—with "'[b]efore' claims focus[ing] on a school's actions before an underlying incident" and "'[a]fter" claims . . . consider[ing] the school's response after it learns of an underlying incident (*Id.* at 24 (citing *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 791 (M.D. Tenn. 2016).) The court noted, however, that that dichotomy fell somewhat short of capturing the complexities of cases involving the indefinitely ongoing dissemination of recorded sexual images or videos, which could persist for weeks, months, years, or even decades. (*Id.*)

MNPS had argued that it did not have sufficient notice of the underlying risks in this case to support the plaintiffs' "before" claims. MNPS did not dispute that its employees were generally aware of the risks of sexual activity on campus or circulation of sexual videos among students. It argued, rather, that Title IX required more specific, student-specific notice regarding the relevant plaintiff and/or the relevant perpetrators. The court rejected that argument. Regarding MNPS's notice, the court wrote:

> [T]here is ample evidence to allow a jury to conclude that MNPS was on notice of the risk of the dissemination of sexual images of its students without their consent, as well as the possibility of subsequent harassment of the students depicted. First, the risk at issue in this case is an obvious and inevitable danger,

given the ages of the students involved and the realities of media and communication technology in this decade. More importantly, however, MNPS schools themselves had witnessed numerous cases that confirmed that risk. One of the SROs who worked at Hunters Lane testified that he could not even put a number on how many instances of students' "sexting pictures" he had dealt with, but estimated that "maybe a dozen" had been "brought to [his] attention" from 2012 to 2017. He estimated having seen five to ten cases involving sexual videos. In all those cases, he testified, he informed the Hunters Lane administration. Detective Carrigan testified that behaviors similar to those at issue in these cases have occurred in every MNPS high school and middle school, although he clarified that he was not necessarily referring to the dissemination of videos that themselves had been filmed on campus.

(Doc. No. 101 at 25–26 (citations omitted).)

Regarding MNPS's argument that it could not be held liable without student-specific notice, the court wrote:

MNPS would have the court erect an artificial barrier around known risks related to widespread misbehavior in favor of a rule that only imposes Title IX liability if a school was aware of a particular problem student or student group likely to commit harassment or a particular student who was especially at risk of being targeted. Nothing in the logic of Title IX or the caselaw construing it supports such a rule. The Title IX standard recognized by the Supreme Court and the Sixth Circuit looks to what is a "clearly unreasonable response in light of the *known circumstances*." [*Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)] (quoting *Davis*, 526 U.S. at 648) (emphasis added). There is no basis for excluding from the "known circumstances" a school district's knowledge that a problem is widespread and recurring throughout its student population. Nor is there any reason to assume that Title IX categorically permits a school district to turn a blind eye to the group dynamics in which harassment sometimes thrives. *See* [*Patterson v. Hudson Area Sch.*, 551 F.3d 438, 448–49 (6th Cir. 2009)] (holding that a school's "isolated success with individual perpetrators cannot shield [it] from liability as a matter of law" in a case where a student "suffered harassment over many school years perpetrated by various students"). Title IX requires only that the school have "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Staehling v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:07-0797, 2008 WL 4279839, at *10 (M.D. Tenn. Sept. 12, 2008) (Echols, J.) (quoting *Folkes v. N.Y. Coll. of Osteopathic Med.*, 214 F. Supp.2d 273, 283 (E.D.N.Y. 2002); citing *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 687 (W.D. Ky. 2003)). Actual knowledge of a serious, widespread problem is at least enough to allow a district to reasonably respond in some way, even if it cannot predict or prevent every future incident.

The reasoning that MNPS wishes the court to graft into Title IX, moreover, would not be adopted by any reasonable person or entity with regard to any other risk. When a driver leaves for work in the morning, he does not know that he is likely to have a collision with a *particular* other driver at a *particular* intersection. But the driver still drives safely, because he knows of a general risk of accidents. By the same token, MNPS does not know that any particular school is likely to have a fire, but that presumably does not stop it from stocking its fire extinguishers and making sure the sprinklers work. Lack of knowledge of a more specific risk does not exonerate one from deliberate indifference to a known general risk. In any event, MNPS had more than merely a general knowledge of the risks at issue, because its disciplinary records are replete with instances of actual notice that its students might behave in the manner described by the plaintiffs

(Doc. No. 101 at 27–28 (footnote omitted).) Accordingly, "[w]hile it may be true that MNPS did not, for the most part, have warning about the specific students addressed in these cases or the specific acts that would occur, those facts are relevant to the adequacy of the school district's preventive actions, not whether it was on sufficient notice of the risk of harassment to give rise to an obligation not to be deliberately indifferent." (*Id.* at 28 (footnote omitted).) The court also rejected arguments by MNPS related to the welcomeness of the sexual activity at issue in the plaintiffs' cases, whether any discrimination against them was on the basis of sex, and whether the harassment they faced was sufficiently severe and pervasive to be actionable. (*Id.* at 29–38.)

Finally, the court turned to the question of whether there were disputed issues of material fact sufficient to support the plaintiffs' arguments that MNPS had acted with deliberate indifference to known risks. The court noted that

> [t]he Sixth Circuit has stressed that, while a district facing known sexual harassment "must respond and must do so reasonably in light of the known circumstances," "no *particular* response is required" in order to comply with Title IX. *Vance*, 231 F.3d at 260–61 (emphasis added). Accordingly, "courts should avoid second-guessing school administrators'" selection of one particular policy or response over another. *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016) (citing *Davis*, 526 U.S. at 648; *Vance*, 231 F.3d at 260).

(*Id.* at 39.) With that in mind, the court addressed two sets of questions: first, whether a

20

reasonable finder of fact could conclude, for the purposes of the "before" claims, that the school district's preventive actions regarding the general risk of sexual misconduct, particularly the creation and circulation of sexual videos, amounted to deliberate indifference; and, second, whether a reasonable finder of fact could conclude, for the purposes of each girl's particular "after" claim, that her school's post-incident handling of the matter amounted to deliberate indifference to the risk of a deprivation of the relevant student's educational rights.

With regard to the "before" claims, the court noted that a number of aspects of MNPS's handling of Title IX matters could be considered to amount to deliberate indifference by a finder of fact, particularly regarding (1) the decision to devolve so much decision-making, including gatekeeping decisions about which cases implicated Title IX, to individual principals who were not sufficiently trained in Title IX issues, rather than relying on a full-time, proactive Title IX coordinator to promulgate appropriate guidelines and training and recognize district-wide trends, (2) the failure to treat the circulation of videos and pictures as a distinct Title IX problem, regardless of the consensual nature of the original sexual activity, and (3) some principals' tendency to treat incidents as Title IX issues only when pressed by parents. (*Id.* at 40–46).

With regard to the "after" claims, the court noted that, according to guidance from the U.S. Department of Education, there are "three dimensions in which a school should 'tak[e] effective corrective actions'" following an incident of peer-on-peer sexual harassment: "first, it must act to 'stop the harassment'; next, the school must take reasonable steps to 'prevent [the harassment's] recurrence'; finally, the school must do what it can to 'remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively.'" (*Id.* at 46 (quoting U.S. Dept. of Education Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties §

V.B.2[6]).) The court then went through the respective schools' handling of the plaintiffs' incidents individually to determine whether a reasonable juror could find that MNPS acted with deliberate indifference in its handling of its duties.

> With regard to the plaintiffs involved in the incident at Maplewood, the court wrote:

> Jane Doe and Mary Doe have introduced ample evidence pursuant to which a jury could conclude that Maplewood significantly mishandled their cases. Specifically, a reasonable juror could conclude that MNPS acted clearly unreasonably by failing to identify the events as cyberbullying; failing to classify them as a potential Title IX violation; failing to involve the school's executive principal; failing to inform the Title IX coordinator; failing to punish those involved in the creation and dissemination of the tape; and failing to provide Jane Doe and Mary Doe assurances that the school would take steps necessary to ensure, insomuch as possible, that they would be able to continue their educations without disruption related to the video or related harassment.

(*Id.* at 48.) The court noted that, although MNPS did not defend every aspect of its handling of the incident, it argued that "even a clearly unreasonable response to harassment cannot form the basis for a Title IX claim, unless it led to future, additional instances of harassment." (*Id.* at 48.) The court conceded that "MNPS may . . . be correct that a clearly unreasonable—but ultimately harmless—response would also be insufficient to establish liability." (*Id.*) The court, however, examined each girl's case in detail and concluded that, for both students, a reasonable finder of fact could conclude that MNPS's response to the incident resulted in a deprivation of educational benefits. Specifically, for Jane, the school's failure to take the circulation of the video seriously as a problem led her to withdraw from school immediately. Mary, on the other hand, was subjected to disruptive bullying until she, too, eventually withdrew. The court therefore did not grant MNPS summary judgment with regard to the girls' "after" claims—although the court also concluded that they were not entitled to summary judgment themselves. (*Id.* at 49–50.)

> The court turned next to Sally Doe's incident at Hunters Lane. The court noted that the

---

[6] Available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

assistant principal who primarily handled Sally Doe's case, unlike the administrators at Maplewood, treated the incident—including, in particular, the videotaping aspect—as serious and maintained ongoing communication with Sally Doe's parents. The initial perpetrator in the Sally Doe incident, moreover, faced significant consequences for his actions, including criminal prosecution. The court ultimately concluded that, although MNPS made some errors in its handling of Sally Doe's case, the facts were not sufficient to allow a reasonable juror to conclude that the school was deliberately indifferent. The court therefore granted MNPS summary judgment with regard to Sally Doe's "after" claim. (*Id.* at 50–52.)

In contrast, the court wrote, Hunters Lane's handling of S.C.'s incident more closely resembled Maplewood's response to the incident involving Mary Doe and Jane Doe, particularly regarding its failure to acknowledge the circulation of the video as a distinct problem that it needed to take ameliorative steps against in order to prevent the disruption of the student's education:

> It may be impossible for a school district to fully shield a student from taunting or bullying after an incident such as the ones at issue here, and Title IX does not expect or require a funding recipient to do so. A reasonable juror could conclude, however, that a school district owes the student, at a minimum, a meaningful assurance that the school recognizes that the circulation of the video poses a distinct and significant risk of harm to the student's education. Without such an assurance, the message sent to the student is that, by engaging in recorded sexual activity, she has forfeited the right to the school's protection from future harassment. S.C., having received no such assurance, was left to assume that she would have to fend for herself against the ongoing harassment she continued to endure, and she, as a result, left Maplewood, disrupting her education in the process. Based on those facts, a reasonable juror could conclude that MNPS's handling of her case gave rise to liability on her "after" claim.

(*Id.* at 53.) As it did with the Maplewood claims, however, the court concluded that contested issues of fact precluded a grant of summary judgment to the plaintiff. The court accordingly denied both motions with regard to S.C.'s "after" claim. (*Id.*)

Finally, the court addressed the plaintiffs' § 1983 claims. The court observed that "[t]he plaintiffs' theories of liability under section 1983 largely mirror their claims under Title IX, and . . . caselaw involving Title IX ensures that shared questions will govern many aspects of both types of claim." (*Id.* at 53–54.) The court considered MNPS's handful of § 1983-specific arguments—primarily involving municipal liability and the standard for failure-to-train claims—and held that MNPS had not established that it was entitled to summary judgment. (*Id.* at 57.) The court also rejected MNPS's argument that it was entitled to summary judgment with regard to the issue of whether the plaintiffs might be entitled to injunctive relief if they prevail. (*Id.* at 57–58.)

Although MNPS had achieved limited success at the time, there can be little doubt that it raised legitimate, debatable legal issues supported by colorable arguments, particularly in light of the relatively limited caselaw available. Accordingly, when MNPS sought to certify the court's ruling for appeal, the court, despite finding MNPS's formulation of the underlying issues lacking, agreed and granted the motion. The court characterized the purely legal issues warranting interlocutory appeal as follows:

> 1. Whether the court erred in denying MNPS summary judgment on its "before" claims based on a lack of sufficient notice, where MNPS did not have actual knowledge of a specific history of harassment involving the plaintiffs, the perpetrators of the harassment, or a specific program or activity in which the plaintiffs and/or perpetrators were enrolled other than the general education program.
>
> 2. Whether the court erred as a matter of law in denying MNPS summary judgment on the ground that the plaintiffs were unable to produce facts sufficient to support a finding of sexual harassment that was so severe, pervasive, and objectively offensive that it effectively barred the plaintiffs' access to an educational opportunity or benefit.

(Doc. No. 112 at 15 (footnote omitted).)

## F. *Kollaritsch*

While the interlocutory appeal was pending, the Sixth Circuit decided *Kollaritsch*. *Kollaritsch* involved Title IX and § 1983 claims filed by four women students at Michigan State University ("MSU") who had allegedly been assaulted by male peers and who "contend[ed] that the [MSU] administration's response was inadequate, caused them physical and emotional harm, and consequently denied them educational opportunities." *Kollaritsch*, 944 F.3d at 618. The district court dismissed some, but not all, of the plaintiffs' claims, and MSU pursued an interlocutory appeal. *Id.*

The Sixth Circuit held that all of the claims should be dismissed and held that, to prevail on a Title IX claim arising out of peer harassment, "a student-victim plaintiff must plead, and ultimately prove, that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries." *Id.* at 618. Moreover, the initial sexual harassment giving notice and the later sexual harassment "must be inflicted against the same victim," meaning that a "plaintiff 'cannot . . . premise the [further harassment] element of her Title IX claim on conduct [by the perpetrator] directed at third parties." *Id.* at 621–22 (quoting *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 363 (6th Cir. 2012); citing *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 451 (6th Cir. 2009) (Vinson, J., dissenting)) (alterations in original).[7] In other words, after a student experiences sexual harassment, and the school becomes aware of the harassment, "at least one more (*further*) incident of harassment"—attributable to the

---

[7] The court notes that the cited passage of *Pahssen* contains two arguable formulations of this rule. The first formulation, on which *Kollaritsch* relies, is absolute in its terms but also specifically addressed only the particular appellant in *Pahssen*. *Pahssen*, 668 F.3d at 363 ("*Appellant* cannot, however, premise the first element of her Title IX claim on conduct directed at third parties. (emphasis added)) Immediately thereafter, the Sixth Circuit states the underlying principle but suggests that it is only "generally" true, seeming to leave open the possibility of exceptions. *Id.* ("Both the plain language of Title IX and controlling case law demonstrate that an individual plaintiff *generally* cannot use incidents involving third-party victims to show severe and pervasive harassment.").

school's improper response to the original harassment—"is necessary to state a claim." *Id.* at 621. The court therefore concluded that, "[b]ecause none of the plaintiffs . . . suffered any actionable sexual harassment *after* the school's response, they did not suffer 'pervasive' sexual harassment as set out in *Davis* and they [could not] meet the causation element" required to establish liability of the government under Title IX or § 1983. *Id.* at 618.

Although the Sixth Circuit did not explicitly identify it as such, *Kollaritsch* was, among other things, an implicit rejection of the multi-pronged approach to responding to incidents of harassment promoted by the Department of Education and relied upon by this court in its earlier opinion. Under the Department of Education approach, a school, after it learns of harassment, has a duty both to prevent the harassment's recurrence and a duty to ameliorate any damage it has already done to the victim student's education. Under *Kollaritsch*, however, the only post-harassment duty that gives rise to a cause of action is the duty to prevent. "A student-victim's subjective dissatisfaction with the school's response is immaterial to whether the school's response caused the claimed Title IX violation." *Id.* at 618. Even if that "subjective dissatisfaction" is entirely reasonable and interferes in the student's education, it is an injury attributable to the initial harassment—for which the school, under *Kollaritsch*, is not responsible—and therefore cannot be the basis for liability on behalf of the school.

The Sixth Circuit grounded some of its reasoning in traditional principles of antidiscrimination law, but it also—following the lead of the Supreme Court in *Davis*—relied on a presumed congressional intent not to overly burden schools in light of the inevitability of some peer-on-peer misconduct. *See id.* at 620 ("[W]e think it unlikely that Congress would have thought [a single incident of student-on-student harassment] sufficient to rise to [an actionable] level in light of the inevitability of student misconduct and the amount of litigation that would be

invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." (emphasis omitted)) (quoting *Davis*, 526 U.S. at 652–53).

Judge Batchelder's full majority opinion in *Kollaritsch* had the support of at least two judges of the three-judge panel and therefore became the opinion of the court. Judge Rogers, however, did not join the full opinion and filed a concurring opinion, raising concerns about the majority opinion's breadth. He noted, in particular, that the majority's treatment of actual notice involved discussion of matters "not at issue" in the case and that had not been "discussed by the parties on appeal." *Id.* at 630 (Rogers, concurring). He concluded by quoting Judge Pierre Leval's admonition against judges' tendency "to promulgate law through utterance of dictum made to look like a holding—in disguise, so to speak." *Id.* (quoting Pierre Leval, *Judging Under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249, 1250 (2006)). Judge Rogers quoted Judge Leval's warning that, "[w]hen we do so, we seek to exercise a lawmaking power that we do not rightfully possess." *Id.*

**G. The Sixth Circuit's Reversal and Remand of This Case**

On January 24, 2020, the Sixth Circuit issued its Order reversing this court's earlier ruling and remanding the case. The court wrote:

> We delayed ruling on Metro's petition pending the outcome of *Kollaritsch* . . . , which raised similar issues. In *Kollaritsch*, we indicated that "a student-victim plaintiff must plead, and ultimately prove, that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries." In *Kollaritsch*, we noted that the initial sexual harassment that triggers a school's notice and the later sexual harassment caused by its unreasonable response "must be inflicted against the same victim." That analysis could affect the district court's decision. But we think it prudent to let the district court decide, in the first instance, *Kollaritsch*'s effect (if any) on these facts.

(Doc. No. 113 at 2 (citations omitted).) The court vacated this court's summary judgment

decision and remanded the case, rendering the previously ruled-on summary judgments once again pending. The plaintiffs argue that *Kollaritsch* has no bearing on this case, and MNPS argues that *Kollaritsch* dictates that this court should grant it summary judgment in full.

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to her own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578

F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Issues Plainly Unaffected by *Kollaritsch*

Although the parties disagree about the scope of the holding in *Kollaritsch*, there are a number of aspects of the court's earlier analysis that are clearly unaffected by the Sixth Circuit's opinion in that case. For example, the court rejected MNPS's arguments that it was entitled to summary judgment because the initial sexual encounters relevant to this case were non-forcible or because the events involved affected both male and female students. Nothing in *Kollaritsch* implicates those issues at all. Similarly, *Kollaritsch* provides no grounds for reconsidering the court's decision to grant MNPS summary judgment with regard to Sally Doe's "after" claim or its decision not to grant the plaintiffs summary judgment. Accordingly, the court will incorporate by reference its earlier Memorandum's analysis of all issues other than those addressed in the remainder of this opinion. The court will focus, here, only on the matters that require reconsideration based on *Kollaritsch*.

### B. "Before" Claims

#### 1. Whether to Wait to Apply *Kollaritsch* Now or Hold the Motions in Further Abeyance

As a preliminary matter, the plaintiffs urge the court not to consider the effect of *Kollaritsch* on this case yet, because a petition for certiorari is still pending in that case, and the Sixth Circuit may still be reversed. The Sixth Circuit, however, remanded the case to this court for the express purpose of considering *Kollaritsch*, and the need to consider the issue on remand has already resulted in significant delay in the progression of the case. Moreover, even if certiorari were granted, it would be questionable whether and to what degree any eventual result would dictate how the court should treat this case. As the court will discuss throughout much of

29

this Memorandum, the holding in *Kollaritsch* was, by its own terms, quite broad; it is entirely possible that the Supreme Court could accept review of *Kollaritsch* and issue a narrower opinion that would have minimal bearing on this case. The better course of action, in the view of this court, is to proceed with reconsideration of summary judgment, including, insofar as *Kollaritsch* requires it, the entry of any judgments appropriate in this case, to begin the process of appellate review more directly focused on the issues raised by the unique circumstances of this litigation, should a party appeal.

### 2. Applicability of *Kollaritsch* to "Before" Claims

With regard to the "before" claims, plaintiffs argue that, because *Kollaritsch* solely involved claims based on MSU's post-incident handling of matters, the court should treat it as having no effect on their "before" claims. MNPS argues that nothing in *Kollaritsch* itself suggests such a distinction and that the holding of *Kollaritsch*, by its own terms, applies to all of the plaintiffs' claims.

The plaintiffs are correct that the Sixth Circuit acknowledged, in *Kollaritsch*, that the case was "not about the sexual assaults," but rather "the University administration and its response." *Kollaritsch*, 944 F.3d at 618. That, however, was merely an accurate statement of the nature of the plaintiffs' claims. What matters is not whether *Kollaritsch* itself was about claims that would be categorized as "before" claims, but whether the Title IX principles that the Sixth Circuit established have implications for such claims. The "before"/"after" claim distinction helpfully refers to different theories of liability under Title IX, but the statute itself does not draw any line confining each theory of liability to its own jurisprudential box. "Before" claims and "after" claims are, for statutory purposes, all just Title IX claims, subject to the applicable Title IX jurisprudence.

There is, moreover, nothing in *Kollaritsch* that suggests that the Sixth Circuit intended to limit its holding in the way that the plaintiffs describe. To the contrary, the majority opinion in *Kollaritsch* is, if anything, unusually broad in its scope and unusually absolute in the detail it employed to set out exactly what a plaintiff must prove to establish liability. At most, the plaintiffs can argue that *Kollaritsch*'s holding does not reach this case and that the opinion's broader pronouncements about Title IX are merely *dicta*.

The problem with that argument, though, is that *Kollaritsch*'s central holding *does* implicate "before" claims, albeit by unavoidable implication. The core holding of *Kollaritsch* is that "the plaintiff must plead, and ultimately prove, [1] an incident of actionable sexual harassment, [2] the school's actual knowledge of it, [3] some further incident of actionable sexual harassment, that [4] the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment." *Id.* at 623–24. A "before" claim, by definition, only satisfies the first element and cannot satisfy the second and fourth elements without becoming an "after" claim. Moreover, the court in *Kollaritsch* was unambiguous that a claim cannot be premised on a school's failure to address risk of sexual harassment based on past incidents of harassment against students other than the plaintiff. *Kollaritsch*, 944 F.3d at 621–22. The type of hypothetical claim rejected—a claim based on a school's failure to protect the plaintiff from risks apparent from prior misconduct directed at other students—is simply a description of *what a "before" claim is*.

Although the breadth of the binding holding in *Kollaritsch* is challenging to define, treating the opinion as having no bearing on "before" claims would be to disregard a substantial portion of its central reasoning—something this court is not inclined to do absent an

extraordinarily persuasive reason to conclude that the principles at issue were not intended by the Sixth Circuit to be controlling on the circuit's lower courts. The fairest reading of *Kollaritsch* is not only that it applies to the plaintiffs' "before" claims, but that it precludes them, because such claims are categorically incapable of satisfying its requirements.

The court's application of *Kollaritsch* to the plaintiffs' claims should not conceal the fact that there may be serious grounds for concern about the breadth of the *Kollaritsch* decision. For one thing, the Sixth Circuit, in announcing a general rule applicable to all Title IX peer harassment claims, did not appear to account for the extraordinarily significant differences between the various educational settings in which Title IX applies. A rule that liability only attaches after a school learns of an incident and fails to prevent a repeat of that incident might make a certain amount sense when one is discussing a university, whose students are mostly adults over whom the institution exercises very limited control. In contrast, however, the power exercised by a high school or middle school over its students "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995). It strikes this court as questionable that Congress intended for a middle school or high school to have no Title IX duty whatsoever to protect its students from peer sexual assault, as long as the school does not know that a specific student is likely to be assaulted. This court, however, is precluded from treating the type of school or the age of the students involved as a ground for distinguishing *Kollaritsch*, because the majority opinion in *Kollaritsch* made abundantly clear that it was extrapolating the principle it announced from the Supreme Court's opinion in *Davis*, which involved a fifth grader. If the rule in *Kollaritsch* follows from *Davis*, then that rule applies just as much to Maplewood and Hunters Lane as it did to MSU.

The plaintiffs' "before" claims, which were based on MNPS's general knowledge of the risk of sexual misconduct of the type they suffered and MNPS's failure to take reasonable preventative steps, cannot be squared with the principles set forth by *Kollaritsch*, particularly the requirements that liability must be attributable to instances of harassment that occurred after the school became aware that the individual student at issue was being or had been harassed. The court accordingly will grant MNPS summary judgment with regard to all of the plaintiffs'' "before" claims.

## C. *Kollaritsch*'s Effect on the Plaintiffs' "After" Claims

MNPS argues that *Kollaritsch* also mandates that the court grant it summary judgment with regard to the "after" claims of Jane Doe and S.C., because they both left their respective schools after administrators became aware of the underlying incidents and before additional harassment could occur. MNPS concedes that Mary Doe continued at Maplewood and was, at times, harassed before she eventually left the school. MNPS argues, however, that she too cannot satisfy the requirements of *Kollaritsch*, because she cannot establish a sufficient causal link between the school's response and the later harassment.

### 1. Jane Doe

*Kollaritsch*, in no uncertain terms, requires at least one additional incident of actionable harassment to occur after school officials learn of the precipitating incident. As MNPS points out, Jane Doe transferred to KIPP Academy immediately, or at least nearly immediately, after Maplewood officials were informed of the incident in which she was involved. Most importantly for the purposes of *Kollaritsch*, Jane Doe conceded, in response to MNPS's Statement of Undisputed Facts, that she was not subject to further harassment after the video was brought to the attention of school officials. (Doc. No. 92-2 ¶¶ 16–17.) In order to support Jane Doe's "after"

claims, she points primarily to the alleged mishandling of the situation on which the court relied in its earlier opinion. *Kollaritsch*, however, rejected any suggestion that Title IX liability could be based on such shortcomings in the absence of at least one incident of further actionable harassment. Jane Doe also argues that, although she was not directly harassed at Maplewood again, she was aware that some of her former Maplewood peers had used derogatory names to refer to her. However, she has identified no grounds that would allow the court to conclude that Maplewood students using improper names to refer to her, when she was no longer a Maplewood student, would be actionable harassment sufficient to satisfy *Kollaritsch*.

The court wishes to be clear about what *Kollaritsch* requires and why it dictates the result that it does here. Under *Kollaritsch*, a parent whose child was harassed, assaulted, or raped by another student and who recognizes that a school is not responding appropriately to her child's predicament has no cause of action, under Title IX, until the school's improper response leads to at least one additional instance of actionable harassment. This is true, under *Kollaritsch*, even if the parent is reasonable or even obviously correct that the school is failing to take the danger posed to her child seriously. In other words, if a parent's child is, for example, raped by another student at school, and the school district and state do nothing to prevent her rapist from attacking her again, the parent's options are (1) withdrawing the child from school or (2) waiting for her to be sexually harassed again—including, potentially, in the form of a second rape—at which point the parent can sue on the child's behalf under Title IX.

That does not mean that *Kollaritsch* was wrongly decided, a question beyond this court's authority to consider. *Kollaritsch* reflects a body of caselaw that, both at the Supreme Court level and in the Sixth Circuit, has reasonably recognized that school administrators have only limited control over the behavior of students and that Congress presumably did not intend to place an

impossible statutory burden on the recipients of federal education funds. This court takes no issue with that general premise and has tried to apply it throughout this case. The question of where Congress drew the line, however, is a genuinely vexing one. At this stage, the court's only choice is to apply the binding precedents of this circuit, and, under *Kollaritsch*, MNPS is entitled to summary judgment with regard to Jane Doe's "after" claims.

### 2. S.C.

MNPS argues that S.C. cannot prevail on her "after" claims because she "never returned to Hunters Lane as a student after" the date of the initial incident giving rise to her claims, April 17, 2017. (Doc. No. 123 at 5.) That assertion may be true—in a sense—in that S.C. never attended the physical campus of Hunters Lane as a student again, and her family eventually moved out of the county. MNPS's characterization, however, elides a considerable amount of complexity. Contrary to any suggestion by MNPS that S.C. simply left Hunters Lane immediately after the incident, she was, in fact, initially *suspended* from Hunters Lane for three days as punishment for her participation in the incident. (Doc. No. 92-11 ¶ 9.) The precise details of the days and weeks immediately following the incident are not entirely clear from the current record, but, according to S.C., "[o]ther than the suspension, [Hunters Lane principal] Dr. Kessler told me that this would blow over in one day," an assurance that left her "shocked," "crushed," frightened of the environment she would face post-suspension. (*Id.* ¶ 12.) S.C. and her parents did not finally decide to withdraw from Hunters Lane until "approximately Early May 2017." (*Id.* ¶ 17.)

S.C. and her mother also complained to Dr. Kessler, while she was still an enrolled MNPS student, that she and her sister were receiving physical threats from other students related to the incident. (*Id.* ¶ 13.) S.C.'s mother, T.C., has corroborated that they informed Dr. Kessler of

35

the threats on April 18, 2017, and that the threats were violent in nature, including gendered and sexualized insults. (Doc. No. 92-12 ¶¶ 9–11.) The threats continued throughout S.C.'s suspension, and the video depicting her was placed on a publicly accessible pornography site. (Doc. No. 92-11 ¶ 16.)

It appears, from the statement of S.C.'s mother, that S.C. may have spent a portion of the time after her suspension receiving treatment at the Oasis Center, a local youth crisis intervention center, after which she "finished the 2016–2017 school year on homebound studies." (Doc. No. 92-12 ¶ 18.) S.C. described the decision not to physically return to Hunters Lane as follows:

> I believed I was in danger if I stayed at Hunters Lane High School and that the school was not taking this matter seriously and failed to reassure me that I would be safe if I returned to school. As a result, a family decision was made for me to withdraw from the school approximately early May 2017, and I finished the school year as a homebound student. The continuing harassment, threats, and sexually-related name calling, as well as the circulation of the video, continued up to my withdrawal from school and, even to this day.

(Doc. No. 92-11 ¶ 17.) Her mother echoes her account, adding that Hunters Lane administrators were aware that she intended to withdraw S.C. from the school because the school had failed to protect her from continued threats and harassment and took no steps to "allow her to remain in school." (Doc. No. 92-12 ¶ 17.) Only later did S.C.'s family move to another county, specifically, "to get away from the threats and environment at Hunters Lane High School." (Docket No. 92-11 ¶ 18.)

There was, in other words, a period of at least around two weeks in which S.C. was still an enrolled MNPS student, and MNPS was aware of harassment being waged against her that arose out of and was intended to thwart an investigation of an on-campus incident. During that period, MNPS allegedly failed to adequately address the matter in a way that would allow S.C. to resume her studies on the same terms as her peers. Such a situation would seem to fit squarely

within the claims that *Kollaritsch* would allow to proceed. The only complicating factor is that S.C. was not on the physical Hunters Lane campus when that harassment occurred. The reason she was not on campus, however, was that the school first suspended her and then apparently tolerated her absence while the matter was addressed.

As broad as *Kollaritsch* is, it does not say anything about such a situation. It may be that Title IX does not typically impose duties related to a student's being harassed outside of school, but the Supreme Court has never held that the on-campus/off-campus distinction presents a categorical bar. To the contrary, the Supreme Court's formulation of potential liability for peer harassment notably shied away from drawing a hard line based on geography, focusing instead on whether the harassment was taking place "'under' an 'operation' of the funding recipient." *Davis*, 526 U.S. at 646 (citing at *Doe v. Univ. of Ill.*, 138 F.3d 653, 662 (7th Cir. 1998)). The Supreme Court's language has been read by at least one circuit court as requiring only a sufficient "nexus between the out-of-school conduct and the school." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122 n.1 (10th Cir. 2008) (citing *Davis*, 526 U.S. at 645). Similarly, Department of Education Guidance has suggested that "there is no 'duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus *and does not involve a program or activity of the recipient*' . . . ."*Doe v. Pennridge Sch. Dist.*, 413 F. Supp. 3d 393, 410 (E.D. Pa. 2019) (quoting Dep't of Educ. OCR, "Q & A on Campus Sexual Misconduct" (Sept. 2017)) (emphasis added).

There are a number of facts in this case suggesting a nexus between the school's authority and interests and the harassment S.C. experienced while suspended and, later, while absent. First and most obviously, the harassment was related to an incident that itself occurred on campus. Second, and perhaps more importantly, the harassment appears to have been directed, at

least in part, at preventing S.C.'s cooperation in the school's own disciplinary investigation related to the in-school incident. Third, S.C.'s physical absence from school was, at least at first, school-mandated in light of her suspension. If a school could escape liability simply by removing a student from its physical premises, the incentive in a case such as this would simply be to suspend or even expel every student in S.C.'s position. The court doubts that Congress intended to create an incentive to punish harassment victims. Fourth, Hunters Lane was specifically informed by S.C.'s mother that the harassment was keeping her out of school—in other words, that it was interfering in her education.

Another potential limitation on a school system's liability for off-campus harassment is that "the deliberate indifference standard holds a school liable for harassment only where the school 'exercises substantial control over both the harasser and the context in which the known harassment occurs.'" *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 324 (6th Cir. 2017) (quoting *Davis*, 526 U.S. at 646). The school's suspension of S.C., however, was, in fact, an exercise of substantial control over the setting in which she might be harassed. Moreover, while a school typically does not have substantial control over students' off-campus actions, the threats in this case were apparently attempts to interfere in the school's own investigation. The court is aware of no settled principle that would prevent a school from exercising disciplinary control over students' attempts to interfere directly in a school disciplinary investigation to intimidate a victim. *See Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 396 (5th Cir. 2015) (holding that a school can address speech "intentionally direct[ed] at the school community . . . , even when such speech originated, and was disseminated, off-campus without the use of school resources"); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 777 (8th Cir. 2012) (holding that a school may take action addressed at out-of-school speech to prevent a

"substantial disruption to the educational setting"); *Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 573 (4th Cir. 2011) (holding that a school can address off-campus speech based on "nexus" between speech and school's "pedagogical interests"); *but* see *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 545 (6th Cir. 2013) (noting that neither the Sixth Circuit nor the Supreme Court had ruled on "whether schools can regulate off-campus, online speech by students"). A reasonable finder of fact could conclude that MNPS's disciplinary authority to protect its investigation translated to sufficient control over the off-campus attempts made by students to thwart it.

The court's prior reasoning regarding S.C.'s "after" claim, therefore, remains largely intact. It may be that *Kollaritsch* limits the evidence on which S.C. can rely to establish her Title IX injuries, because she now must focus on the actual post-incident harassment that she endured rather than broader aspects of the school's alleged mishandling of her case. However, a female student's being hounded out of school by threats and harassment related to her participation in a school's investigation into an on-campus sexual event is well within the core Title IX issues that survive *Kollaritsch*. A reasonable juror, moreover, could find that the school's handling of S.C.'s case—which consisted in significant part of treating her as a perpetrator and downplaying the unique problems associated with the circulation of the video—caused the situation to spiral out of control. The court, accordingly, will not grant MNPS summary judgment with regard to S.C.'s "after" claim.

3. Mary Doe

MNPS concedes that Mary Doe, unlike Jane Doe, remained at Maplewood for a period after MNPS became aware of the underlying incident. MNPS argues, however, that Mary Doe's "after" claims fail *Kollaritsch* for a different reason: that she cannot establish that MNPS's

allegedly inadequate response caused any later incidents of harassment. In particular, MNPS relies on the facts that (1) three weeks elapsed between the initial Maplewood incident and the school's learning that there was a video of the incident and (2) Mary Doe's harassment was not by the students who originally participated in the initial incident but by other students who had seen or heard about the video. MNPS's argument, in essence, is that it was given no chance to stem the circulation of the video in time and Mary Doe, accordingly, cannot establish "but for" causation with regard to further harassment related to the video.

MNPS's argument, however, assumes that the only thing it could have done to protect Mary Doe would have been to somehow intercept the video before it was circulated among her peers. The facts that Mary Doe has presented, however, show more than merely a school unable to interdict a video. She has provided evidence that Maplewood administrators were aware that an environment had developed in which the circulation of sexual videos of other students was understood and at least grudgingly accepted as "a game that the seniors play." (Doc. No. 92-23 at 77.) Mary Doe testified that she complained to school personnel about the bullying she experienced, but they "didn't do anything about it." (Doc. No. 92-10 ¶ 11.)

The school's blasé attitude is arguably confirmed by the fact that the school elected not to punish any of the students involved in the sexual activity or videotaping "beyond verbal discipline," ostensibly because it was "an opportunity to impart some wisdom and life instruction," and the principal "did not want to subject the students to potential humiliation and discipline for a consensual act." (Doc. No. 89 ¶¶ 61–62; *see* Doc. No. 70-16 at 11.) The circulation of Mary Doe's video, however, was not a consensual act, and her humiliation was, if anything, exacerbated by the school's inaction. Although, as this court has repeatedly emphasized in this litigation, a student does not have a right under Title IX to dictate any

particular disciplinary course of action with regard to the actions of other students, that does not mean that a reasonable finder of fact cannot consider the discipline handed out as part of an argument that the school displayed deliberate indifference to the risk of future harassment.

MNPS may be correct that it is difficult to establish "but for" causation in a case such as this, in which a school's failures are argued to have created an environment in which multiple different students chose to take part in harassment over time, as opposed to a case in which there is a single, identifiable harasser that the school allegedly failed to constrain. The fact that a factual question is difficult, however, is not a reason to grant summary judgment. The standard, as always, is whether a reasonable finder of fact could reach the conclusion contrary to the conclusion urged by the movant.

Although *Kollaritsch* changes the terrain on which peer-on-peer Title IX harassment cases are litigated, it does not mandate summary judgment here. To the contrary, Mary Doe's claims seem to be the type well within the contemplation of *Kollaritsch*. Mary Doe was harassed, her school was made aware of it, it responded (or failed to respond), and Mary Doe has put forth a plausible account of how its response contributed to the continuation of ongoing harassment. The court therefore will not grant MNPS summary judgment with regard to Mary Doe's "after" claims.

## D. The § 1983 Claims

As the court explained in its previous opinion, the plaintiffs' theories of liability under § 1983 largely mirror their claims under Title IX, and the caselaw governing each of the two statutes mandates that most issues will be resolved in the same manner with regard to each set of claims. *Kollaritsch*, moreover, says relatively little about § 1983 claims against government entities and does not appear to disturb the preexisting status quo that Title IX and § 1983 claims

based on school harassment will, on most (though not all), substantive issues, rise and fall together.

MNPS's briefing on this matter largely reiterates the arguments it made prior to the court's earlier ruling on the motions for summary judgment, and the court remains similarly unpersuaded. For example, MNPS emphasizes the plaintiffs' supposed inability to link their schools' actions to district-level failures of training and organization. The evidence on that matter, however, was voluminous and raised significant and plausible allegations that MNPS failed, on a system-wide level, to implement appropriate structures to recognize and adapt to the risks posed to its female students in light of technological and social developments related to the creation and transmission of sexual videos and images. The court accordingly will not grant MNPS summary judgment with regard to the § 1983 claims of the two plaintiffs who, after *Kollaritsch*, still have viable Title IX claims. The court will, however, grant MNPS summary judgment with regard to the § 1983 claims of Sally Doe and Jane Doe.

## IV. CONCLUSION

For the foregoing reasons, MNPS's Motions for Summary Judgment regarding the claims of Jane Doe (Doc. No. 76) and the claims of Sally Doe (Doc. No. 83) will be granted in full, and summary judgment will be awarded to MNPS with regard to those plaintiffs' claims. MNPS's Motions for Summary Judgment regarding S.C. (Doc. No. 71) and Mary Doe (Doc. No. 82) will be granted in part and denied in part. The court will dismiss those plaintiffs' claims based solely on MNPS's actions prior to the underlying incidents described in their Complaints, but not their Title IX or § 1983 claims based on the events thereafter. The plaintiffs' Motion for Partial Summary Judgment (Doc. No. 87) will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
U.S. District Judge